NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

PHILLIP DANIEL BOBBITT, *Appellant.*

No. 1 CA-CR 22-0029
FILED 12-20-2022

Appeal from the Superior Court in Maricopa County
No. CR2020-114199-001
The Honorable Dewain D. Fox, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Gracynthia Claw
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Dawnese Hustad
*Counsel for Appellant*

**MEMORANDUM DECISION**

Judge Jennifer B. Campbell delivered the decision of the Court, in which Presiding Judge Brian Y. Furuya and Judge Paul J. McMurdie joined.

**C A M P B E L L**, Judge:

¶1        Phillip Daniel Bobbitt appeals his conviction and sentence for first-degree premeditated murder. He argues the superior court erred by admitting his text-message exchanges with the Victim and a witness's testimony that the Victim was afraid to be alone with him. For the following reasons, we affirm.

**BACKGROUND[1]**

¶2        In April 2020, Bobbitt shot and killed his estranged wife. In June 2019, after 21 years of marriage, Bobbitt filed for divorce. At that time, the couple lived in California. Shortly after the filing, the Victim moved to Arizona. Their two minor daughters soon joined her.

¶3        In July or August, Bobbitt texted the Victim a link to a house in their neighborhood posted for sale, which led to the following text-message exchange:

> [The Victim]: You looking to buy a house out here?
>
> [Bobbitt]: Maybe. . .
>
> [Bobbitt]: I don[']t think I could afford it by myself. We are going to get 100K less than we thought for [the California] house.
>
> [Bobbitt]: I was looking for non HOA homes, but there is a[]lot more with HOA fees. Nice ones in the 300's[.]

---

[1]        We view the facts in the light most favorable to sustaining the verdict, resolving all reasonable inferences against Bobbitt. *State v. Mendoza*, 248 Ariz. 6, 11, ¶ 1 n.1 (App. 2019).

[Bobbitt]: Did I upset you? If I did, I apologize. I am thinking financially.

[The Victim]: I'm not upset. You can buy a house wherever you want to.

[Bobbitt]: I want to buy a house with you. In Gilbert, so you can still be close to your friends.

[Bobbitt]: And we can all be together as a family[.]

[The Victim]: Yes, this is upsetting me.

[Bobbitt]: Can't you give me a chance? Was I that horrible of a husband and father? I tried to make you feel special anytime [I] could. I love you. I need our family back. I can[']t live like this.

[The Victim]: Please stop. I've told you how it makes me feel, you are giving me so much anxiety.

[Bobbitt]: Ok.[ ] I'll leave you alone.

[Bobbitt]: Bye.

[The Victim]: I just got out of the shower.

[Bobbitt]: I am quitting this job when [our son] comes back. I don[']t care about our finances. I'll let the house foreclose. I ain't doin[g] [expletive] from now on. I am on a path of destruction from here on out.

That fall, Bobbitt moved to Arizona and rented an apartment about a mile away from the Victim.

¶4     The day before the murder, the two exchanged the following text messages:

[Bobbitt]: Hello . . . , if you are free tonight, would you like to go on a walk with me? I would like an opportunity to talk with you uninterrupted for a minute.

[Bobbitt]: Hi.

[Bobbitt]: Chello?

3

> [Bobbitt]: Are you ok? Everything alright? Blink once for yes and twice for no.
>
> [The Victim]: Yes, I'm fine. I would prefer not to. It makes me too uncomfortable.
>
> [Bobbitt]: I just want to talk. Face to face, nice conversation, no negative[it]y. Please. . . .
>
> [Bobbitt]: All these years and the things we been thru together. We can[']t talk?
>
> [Bobbitt]: [sad-face emoji]
>
> [Bobbitt]: I will be dropping [the] girls off with you tomorrow morning at 7 am[.]

When the Victim did not respond to Bobbitt's first several messages, he became angry and told their adult son that he was "going to snap [the Victim's] [expletive] neck[.]"

¶5            The following morning, Bobbitt sent the Victim a text message that read, "Good morning . . . Are [you] awake? We [are] getting ready to head your way[.]" Bobbitt drove to her apartment complex alone, taking a 9mm handgun with him. He parked near the gated entrance, then sent the Victim a text message stating, "We here." After the Victim parked next to Bobbitt's truck, he approached her car and shot her 14 times in rapid succession. The Victim died from the gunshot wounds.

¶6            Bobbitt fled the scene, eventually stopping in a remote desert area, where he called 9-1-1 to report the murder. He sent a series of text messages to family members, work colleagues and friends confessing to the crime, "saying [his] goodbyes[,] and apologizing for what [he] had done."

¶7            Once the police located Bobbitt in the desert, he told an officer that he went there to "die in peace." After the officer asked whether Bobbitt intended to commit suicide before that day, Bobbitt explained his "plan": "Woke up. Made my lunch. Brushed my teeth, like every day. I was supposed to drop the girls off with . . . my wife. I didn't bring the girls. And, I shot her."

¶8            Bobbitt was charged with one count of first-degree premeditated murder. At trial, he conceded guilt on the lesser-included

offense of second-degree murder. With this concession, the only question before the jurors was whether he acted with premeditation.

**¶9**        The State theorized that Bobbitt murdered the Victim out of resentment once he realized that she did not intend to rekindle their relationship. To help establish that theory, the State proffered the text-message exchanges. *Supra* ¶¶ 3–4. It argued that the evidence was admissible under Arizona Rule of Evidence ("Rule") 803(3) and *State v. Wood*, 180 Ariz. 53, 62 (1994), to show her then-existing state of mind.

**¶10**        The State sought to introduce the text messages on direct examination of the Victim's best friend and neighbor, Jolene, who had received screenshots of the messages from the Victim. It also planned to solicit testimony from Jolene describing her "knowledge of [the Victim's] general fear" of Bobbitt. Bobbitt objected on relevance and unfair-prejudice grounds.

**¶11**        Finding *Wood* persuasive, the superior court concluded that the Victim's text messages and Jolene's proffered testimony came within the state-of-mind hearsay exception under Rule 803(3). The court also determined that Bobbitt's text messages were admissible as party-opponent statements under Rule 801(d)(2). Following the ruling, the State introduced the evidence while examining Jolene and elicited testimony that the Victim was "scared to go meet [Bobbitt] alone."

**¶12**        Bobbitt testified in his defense. He admitted that he shot and killed the Victim but denied that he intended or planned the murder. By his account, his daughters refused to wake that morning, so he decided he would visit the Victim alone to discuss various divorce and custody matters with her. When the Victim arrived, he explained why the girls were not with him, then told her that he was "real [messed] up right now." The Victim yelled in response, "[Expletive] you; why don't you just kill yourself already." The next thing he claimed to remember was driving towards a mountain. He testified he had no memory of shooting her.

**¶13**        The jury found Bobbitt guilty as charged. The superior court sentenced him to natural-life imprisonment. Bobbitt timely appealed.

## DISCUSSION

### I.    Admission of the Text-Message Evidence

¶14        Bobbitt argues the superior court erroneously admitted his text-message exchanges with the Victim. We review its ruling for an abuse of discretion. *State v. Fischer*, 219 Ariz. 408, 416, ¶ 24 (App. 2008).

¶15        A person commits first-degree premeditated murder by intentionally or knowingly causing the death of another person with premeditation. A.R.S. § 13-1105(A)(1). Premeditation requires proof that a defendant "reflected on the decision before killing." *State v. Thompson*, 204 Ariz. 471, 479, ¶ 32 (2003); *see* A.R.S. § 13-1101(1). "An act is not done with premeditation if it is the instant effect of a sudden quarrel or heat of passion." *Thompson*, 204 Ariz. at 479, ¶ 32; *see* A.R.S. § 13-1101(1); *see also State v. Sprang*, 227 Ariz. 10, 12, ¶ 6 (App. 2011) ("Second-degree murder is a lesser-included offense of premeditated first-degree murder, the difference between the two being premeditation."). The prosecution rarely acquires direct evidence of premeditation and thus "may use all the circumstantial evidence at its disposal in a case to prove premeditation." *Thompson*, 204 Ariz. at 479, ¶ 31.

### A.    Admissibility Analysis Under 803 Hearsay Exception

¶16        Rule 803(3) provides an exception to the general prohibition against the admission of hearsay, authorizing the introduction of statements describing "the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed." "[A] victim's state of mind is relevant to show a defendant's motive under Rule 803(3)" as long as the statement mirrors the "declarant's present feeling or future intention rather than look backward, describing declarant's past memory or belief about another's conduct." *State v. Fulminante*, 193 Ariz. 485, 495–96, ¶¶ 32, 34 (1999); *see Wood*, 180 Ariz. at 62 ("The statements about [the victim's] fear and desire to end the relationship helped explain Defendant's motive.").

¶17        Based on the State's premeditation theory, we find no error in the admission of the text-message evidence. The superior court correctly reasoned that the messages constituted non-hearsay evidence under Rule 801(d)(2). His statements had significant probative value to the question before the jury, revealing his desire to salvage his marriage and his evident frustration when the Victim rebuffed his overtures.

¶18　　　　　Turning to the Victim's text messages, her statements expressed her contemporary anxiety, distress, and discomfort in response to Bobbitt's comments that he loved her, sought to reunite their family, hoped to buy a house for them, and wanted to meet her alone. Her statements carried substantial probative weight for the jury: they showed her desire to end their relationship and her rejection of his advances, which in turn provided a plausible motive for Bobbitt—a spurned spouse—to commit the murder. Importantly, the Victim's statements did not impermissibly describe a past memory or belief about Bobbitt's conduct, nor did they improperly recount "the factual occurrence that engendered [her] state of mind." *Fulminante*, 193 Ariz. at 495, ¶ 32. The superior court reasonably determined that her replies satisfied Rule 803(3)'s requirements.

## B.　　　Admissibility Analysis Under 403 Balancing Test

¶19　　　　　Bobbitt nonetheless asserts the superior court should have excluded the Victim's text messages under Rule 403 because they were "vague, leaving too much room for speculation." In support, he posits several alternative innocent explanations for her comments. But "it [is] the function of the jury to decide what reasonable inferences could be drawn from the evidence," not this court. *State v. Arce*, 107 Ariz. 156, 161 (1971); *see also Lavender v. Kurn*, 327 U.S. 645, 653 (1946) (explaining impermissible speculation occurs when there is "a complete absence of probative facts to support the conclusion reached"). And we resolve those inferences against him here. *Mendoza*, 248 Ariz. at 11, ¶ 1 n.1.

¶20　　　　　Bobbitt also argues the 2019 text messages do not withstand Rule 403 scrutiny because (1) his path-of-destruction comment was the "*only* probative statement" they contained, and (2) they were too old to remain relevant. We disagree.

¶21　　　　　Courts may exclude relevant evidence if "its probative value is substantially outweighed by a danger of . . . unfair prejudice." Ariz. R. Evid. 403. "Unfair prejudice means an undue tendency to suggest decision on an improper basis . . . such as emotion, sympathy or horror." *State v. Riley*, 248 Ariz. 154, 177, ¶ 70 (2020). The superior court is afforded considerable discretion in determining whether proffered evidence is relevant and admissible, and Rule 403 balancing is "a matter particularly and appropriately left to [its] discretion." *State v. Rose*, 231 Ariz. 500, 513, ¶ 62 (2013).

¶22　　　　　As noted above, the 2019 messages show the history of Bobbitt's desire to reconcile with the Victim, reunite his family, and show a

pattern of anger in response to the Victim's rebuff. Based on that history, the jury could reasonably infer Bobbitt's resentment of the Victim grew over the separation, peaking on the night before the murder, when she refused to meet with him. His repeated pleas that night justifiably bolster that inference. Within that context, his path-of-destruction message allowed a rational juror to conclude his threat ultimately culminated in him contemplating murder, particularly when considered in conjunction with other evidence indicating Bobbitt's growing frustration and ire directed towards the Victim. Finally, even though the 2019 texts were exchanged several months before the murder, this lapse in time does not render those messages inadmissible. *See State v. Bible*, 175 Ariz. 549, 593 (1993) ("[T]emporal remoteness goes to weight, not admissibility."). The passage of time does not preclude probative evidence from being admissible. The court must consider the passage of time in weighing the probative nature of the evidence against the prejudicial impact of the evidence.

**¶23**　　　　Rule 403 bars unfairly prejudicial evidence from being admitted; it does not serve to shield defendants from harmful evidence in general. To that end, Bobbitt does not explain why the passage of time renders the text messages inadmissible or demonstrate the superior court struck the wrong balance under Rule 403. Accordingly, the superior court did not abuse its broad discretion in admitting the challenged evidence.

## II. Admission of Jolene's Testimony

**¶24**　　　　Bobbitt contends the superior court violated Rule 602's personal-knowledge requirement by admitting Jolene's testimony that (1) he had sent the text messages to the Victim and (2) the Victim was afraid to meet with Bobbitt alone. Although Bobbitt concedes he "did not specifically object under Rule 602," he asserts his various other objections sufficiently preserved his claim of error. He is incorrect. *See State v. Zuck*, 134 Ariz. 509, 513 (1982) ("If evidence is objected to on one ground and admitted over the objection, other grounds not specified are waived."). By failing to object under Rule 602, our review is limited to fundamental, prejudicial error. *State v. Escalante*, 245 Ariz. 135, 138, 142, ¶¶ 1, 21 (2018).

**¶25**　　　　To establish fundamental error, Bobbitt must first show the superior court erred. *Id.* at 142, ¶ 21. He must then establish, under the totality of the circumstances, that the trial error (1) went to the foundation of his case, (2) took away a right essential to his defense, or (3) was so egregious that he could not possibly have received a fair trial. *Id.* "If the defendant establishes fundamental error under prongs one or two, he must make a separate showing of prejudice[.]" *Id.*

¶26 Here, Bobbitt failed to present any argument explaining why the alleged errors were fundamental, much less how the alleged errors cause him prejudice. In failing to do so, he has waived this claim entirely. *See State v. Vargas*, 249 Ariz. 186, 190, ¶ 13 (2020) (reviewing courts need not consider general, undeveloped claims of error); *State v. Carver*, 160 Ariz. 167, 175 (1989) (failing to argue a claim typically waives and abandons that claim).

¶27 Waiver aside, Bobbitt is not entitled to relief. Witnesses "may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter," which "may consist of the witness's own testimony." Ariz. R. Evid. 602; *State v. Ayala*, 178 Ariz. 385, 387–88 (App. 1994). Lay witnesses may offer inferences and opinions when their testimony is (a) rationally based on their perceptions and (b) helpful in understanding their testimony or determining a fact in issue. Ariz. R. Evid. 701; *Ayala*, 178 Ariz. at 387–88.

¶28 We examine the challenged instances of Jolene's testimony in turn. First, even if we assume Jolene lacked the requisite personal knowledge to testify that Bobbitt had authored the text messages, he admitted he was the author in his trial testimony. Because of his admission, any hypothetical trial error would not qualify as fundamental or prejudicial. *See Escalante*, 245 Ariz. at 142, 144, ¶¶ 21, 31 (considering the entire trial record in determining whether an error is fundamental and prejudicial).

¶29 Second, Bobbitt has not shown error, fundamental or otherwise, in the admission of Jolene's testimony. Jolene recounted that (1) the Victim was her best friend, coworker, and next-door neighbor; (2) the Victim moved to Arizona at Jolene's suggestion; (3) once the Victim moved to Arizona, they saw each other almost every day; (4) they regularly talked about the Victim's divorce; (5) they traveled on business trips together, and Bobbitt had at times accompanied them; and (6) the Victim often sent her screenshots of the Victim's text-message exchanges with Bobbitt. Based on her relationship with the Victim and her observations, she had sufficient personal knowledge to testify that the Victim was scared to be alone with Bobbitt. *See* Ariz. R. Evid. 602, 701; *Ayala*, 178 Ariz. at 387–88. The court did not commit error in admitting this testimony.

**CONCLUSION**

¶30     For the foregoing reasons, Bobbitt's conviction and sentence are affirmed.



AMY M. WOOD • Clerk of the Court
FILED:    AA